THE HONORABLE JOHN C. COUGHENOUR

1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

RANDALL FONTANA,                               CASE NO. C13-0245-JCC

10
                                   Plaintiff,        ORDER
11
                v.
12
CITY OF AUBURN, *et al.*,
13
                                   Defendants.
14

15     This matter comes before the Court on Defendants' motion for summary judgment (Dkt.

16 No. 25) and the parties' stipulated motion to dispense with the admitted facts portion of the

17 pretrial order (Dkt. No. 33). Having thoroughly considered the parties' briefing and the relevant

18 record, the Court finds oral argument unnecessary and hereby GRANTS Defendants' summary

19 judgment motion and DENIES the parties' motion to dispense with the admitted facts portion of

20 the pretrial order as moot.[1]

21
22
---

23     [1] Both parties have requested oral argument, but the Court denies these requests. Oral argument is not
necessary where the party opposing the summary judgment motion would suffer no prejudice from the lack of
24 argument. *Houston v. Bryan*, 725 F.2d 516, 517–18 (9th Cir. 1984). "When a party has [had] an adequate
opportunity to provide the trial court with evidence and a memorandum of law, there is no prejudice [in refusing to
grant oral argument]." *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998) (quoting *Lake at Las Vegas Investors
25 Grp., Inc. v. Pac. Malibu Dev. Corp.*, 933 F.2d 724, 729 (9th Cir. 1991)) (alterations in *Partridge* ). "In other words,
a district court can decide the issue without oral argument if the parties can submit their papers to the court." *Id.*
26 Here, the issues have been thoroughly briefed by the parties and the Court has determined that oral argument would
not be of assistance in deciding this matter. *See* Local Rules W.D. Wash. CR 7(b)(4).

I.      **BACKGROUND**

This case arises out of the allegedly unlawful arrest and prosecution of Mr. Randall Fontana, who was arrested and charged with misdemeanor Harassment after allegedly making statements to an Alaska USA Credit Union ("AKUSA") employee that were threatening to police officers. On December 4, 2009, an AKUSA employee called the Auburn Police Department to report an incident that occurred earlier in the day at the Credit Union's Auburn, Washington branch. An Auburn police officer responded to the scene and interviewed Ms. Nicole Firth, the AKUSA employee who had the alleged interaction with Mr. Fontana that day. She provided a typed statement that read as follows:

> During my lunch break today (12:20ish), a gentleman who frequents our branch came over to stand next to me while I was eating my lunch at the Starbuck's back bar. This is not unusual as he often stops by to chat and whatnot with whoever on most days he comes into the branch. He was holding a newspaper and talking to me while I was eating, asking if I read the newspaper . . . I told him that I did not as I do not have cable and I just look up my news online. He then made the comment that *I need to watch the news "in the near future."* I asked him why? If anything special was going on, and *he said to "just watch the news, you may see me and think 'Hey I know that guy. I recognize that mug shot'"* He is sometimes very strange and off the wall comments from this man are ordinary, so I really didn't think much about it. Several hours later, he came to make a withdrawal from his account with AKUSA (withdrawal receipt reads 3:37p.m. Washington time). He then *told me again to tune in to the news so I "can see someone I know on the news."* I asked him pointedly "Are you doing anything special or going to have a story on the news?" *He told me "Its going to be big, bigger than what happened with the Lakewood police officers thing."* He didn't say anything else, I told him to have a good night and logged off my terminal to immediately report the strange commentary to my supervisor.

(Dkt. No. 27, Ex. B) (emphasis added).[2] The Auburn police officer completed a suspicious circumstances report, and Sgt. James Nordenger, an Auburn detective, ultimately received the report and began an investigation. (*Id.* Ex. A, at 1.)  As the parties indicate, it is undisputed that

---

[2] Mr. Fontana denies making the statements at issue. However, it is undisputed that Ms. Firth informed the Auburn PD about his alleged statements and that Sgt. Nordenger received notice of Ms. Firth's report.

1   less than one week before Mr. Fontana allegedly made these statements, four City of Lakewood

2   police officers were publically murdered. Mr. Fontana's alleged reference to his unidentified

3   action being bigger than the "Lakewood police officers thing" is accordingly an undisputed

4   reference to his action being bigger than the recent murder of four police officers.

5           After Sgt. Nordenger received the report of Mr. Fontana's alleged statements, he and

6   another officer contacted Mr. Fontana on Monday December 7, 2009 as he was leaving his place

7   of employment, the "Grocery Outlet." (Dkt. No. 27, Ex. A at 2; Ex. C at 28–29.) The exact

8   substance of this exchange is disputed, but all parties agree that at a minimum, Sergeant

9   Nordenger told Mr. Fontana "Don't fuck with us" to make clear that Mr. Fontana should not

10  assault or kill police officers.[3] (*Id.*, Ex. C at 52.) It is also undisputed that Sgt. Nordenger asked

11  Mr. Fontana if he was in fact Randall Fontana and whether he had been at AKUSA's Auburn

12  branch on certain dates and at certain times. According to Mr. Fontana, Sgt. Nordenger was

13  confrontational during this exchange and asked questions that did not make sense to him;

14  specifically, Mr. Fontana states that when asked whether he liked or disliked police, he "never

15  indicated that he disliked police." (Dkt. No. 29 at ¶ 15.) Finally, it is undisputed that Mr. Fontana

16  ended the exchange by walking away to catch his bus. He was not arrested at that time.

17          After contacting Mr. Fontana on December 7, 2009, Sgt. Nordenger created an "Officer

18  Safety Bulletin" that was distributed to various regional law enforcement agencies. That bulletin

19  stated that Mr. Fontana spoke with an AKUSA employee and made statements like "Watch the

20  news in the near future, Just watch the news, you may see me and think Hey, I know that guy. I

21  recognize that mug shot," and "It's going to be big, bigger than what happened with the

22  Lakewood Police Officers thing," and that the employee called 911. (Dkt. No. 27, Ex. D.) The

23  bulletin also stated that Mr. Fontana had several previous contacts with the Auburn Police, which

24

25

26      [3] Mr. Fontana also states that Sgt. Nordenger said: "[w]e're gonna make it rough on you, worse than what happened to the guy in Lakewood." (Dkt. No. 29 at ¶ 15.) Because the Court is reviewing Defendants' summary judgment motion, the Court credits this statement for purposes of this Order.

1  included Verbal Domestics, Civil Issues, and Traffic Infractions; that he was named as an

2  "other" in a Federal Way homicide investigation in 2008; that Mr. Fontana "may" suffer from

3  mental illness but that no diagnosis had been confirmed; and that "[t]here is no PC for Fontana at

4  this time." (*Id.*)

5          Sgt. Nordenger continued his investigation after issuing the Officer Safety Bulletin and

6  received responses from various law enforcement officials in the region over the course of a one

7  week period. In a December 8, 2009, e-mail from a Federal Way detective, Sgt. Nordenger was

8  informed that Mr. Fontana had been a person of interest in a homicide investigation several years

9  earlier. Mr. Fontana was cleared in that investigation by DNA, but Sgt. Nordenger states that "it

10  was learned that [Mr. Fontana] had been conducting surveillance on the homicide location and

11  had been writing down license plate numbers there." (Dkt. No. 24 at ¶ 11.) Additionally, both

12  Bellevue PD and Kirkland PD responded to the bulletin early on December 11, 2009, advising

13  that their agencies had worked security detail at the Lakewood Officers' memorial at the Tacoma

14  Dome. (*Id.* at ¶ 13, Ex. B.) They informed the Auburn PD that Mr. Fontana had shown up to the

15  event intoxicated and was denied entry.[4] (*Id.*) Sgt. Nordenger also received notice from a

16  Department of Social and Health Services ("DSHS") employee that Mr. Fontana had expressed

17  "growing anger" about his welfare benefits being cut and that DSHS had concerns about the

18  safety of its employees, but noted that Mr. Fontana had not made any express threats. (Dkt. No.

19  27, Ex. A at 4.) Finally, in the days following Mr. Fontana's alleged statements, Sgt. Nordenger

20  visited Ms. Firth at AKUSA and obtained a positive photo montage identification; Mr. Firth

21  confirmed that Mr. Fontana was the individual who had made the statements to her on December

22  7, 2009. (*Id.* at 1.)

23          On December 11, 2009, after receiving notifications that Mr. Fontana had attempted to

24  attend the Lakewood Officers' funeral at the Tacoma Dome, Sgt. Nordenger asked a King

25  

26  [4] Mr. Fontana denied that he attempted to attend the Lakewood Officers' funeral at the Tacoma Dome. However, he does not dispute that Sgt. Nordenger received the notices discussed herein.

County deputy prosecutor to file felony charges against Mr. Fontana. (Dkt. No. 27, Ex. A, at 3.)
The King County prosecutor verbally declined to do so. (*Id.*) Sgt. Nordenger then contacted an
Auburn deputy prosecutor in person and provided the deputy prosecutor with the case file. (*Id.*;
Ex. C, at 77.) According to Sgt. Nordenger, the two discussed Mr. Fontana's statements, their
proximity to the Lakewood murders, Mr. Fontana's "strange behavior in the Grocery Outlet
parking lot," and information received from other agencies. (Dkt. No. 24 at ¶ 17.) In this
conversation, Sgt. Nordenger said to the prosecutor "Well, I want to go arrest him if you're
gonna file it." (Dkt. No. 27, Ex. C at 77.) The prosecutor said "OK," and according to Sgt.
Nordenger, the two agreed that probable cause existed to arrest Mr. Fontana.[5]

Sgt. Nordenger disseminated a probable cause bulletin later that day. (Dkt. No. 27, Ex.
F.) That bulletin noted, like the Officer Safety bulletin, the statements made to the AKUSA bank
teller that referenced the Lakewood police murders. The bulletin also noted that Mr. Fontana was
a suspect in a Federal Way homicide investigation but that he had been cleared; that he attempted
to attend the Lakewood Officers' funeral on December 9, 2009, but had been turned away; that
he had been "argumentative" and showed a "dislike for police" when contact was made with him
at his place of employment; and that Mr. Fontana may have a mental illness but that it could not
be confirmed. (*Id.*) The bulletin stated that probable cause existed to arrest Mr. Fontana for
misdemeanor Harassment. (*Id.*)

The next day, on December 12, 2009, Officers Mast, Christen, Glenn, Person, Bernard,
and Feero of the Auburn Police Department went to the Auburn Grocery Outlet to arrest Mr.

---

[5] Sgt. Nordenger states that he believed at this time that probable cause existed to arrest Mr. Fontana for "Threats to Do Harm." (Dkt. No. 24 at ¶ 16.) However, it is undisputed that he actually discussed whether Mr. Fontana could be arrested for Harassment based on his allegedly threatening statements; that the probable cause bulletin was issued based on probable cause to arrest Mr. Fontana for Harassment; that Sgt. Nordenger cited Mr. Fontana for Harassment after his arrest; and that Mr. Fontana was originally charged with Harassment under Auburn City Code 9.42.020. That provision makes it a crime to *knowingly* threaten to cause bodily injury or physical damage. To the extent that Sgt. Nordenger states that the use of Harassment rather than "Threats to do Harm" was a "scrivener's error," the Court rejects such an assertion. One error may have been unintentional, but it is clear that at every step of the way, Sgt. Nordenger and the prosecutor believed Mr. Fontana to have violated the Harassment statute (first as a felony violation and later as a misdemeanor).

Fontana. (*Id.*, Ex. A at 4.) After locating Mr. Fontana in the store, Officer Feero, who is not named as a defendant in this lawsuit, handcuffed Mr. Fontana and Officer Mast read him his *Miranda* rights. (Dkt. No. 24 at ¶ 19.) Sgt. Nordenger visited Mr. Fontana at the jail once he had arrived and cited him for Harassment and Possessing a Legend Drug Without a Prescription.[6] (Dkt. No. 27, Ex. A at 5.) In his police report, Sgt. Nordenger indicated that "based upon Fontana's statements made to the witness, him being argumentative when being contacted, attempting to show up at the Tacoma Dome during a police funeral, and being a suspect in a Federal Way homicide, I am fearful that Fontana will attempt to injure or kill an officer when given a chance." (*Id.*)

The City of Auburn charged Mr. Fontana with Harassment, but subsequently filed the charge of "Threats to do Harm" pursuant to Auburn City Code 9.14.010 and dismissed the Harassment charge. (Dkt. No. 28 at ¶ 2.) Mr. Fontana was arraigned and then obtained private defense counsel. The Court docket indicates that on December 24, 2009, the Court found that probable cause existed to bind Mr. Fontana over on the Harassment and Threats to do Harm charges. (Dkt. No. 28, Ex. A at 1, 6.) After his attempts to have the prosecutor dismiss the charge proved unsuccessful, Mr. Fontana filed (through counsel) a motion to dismiss pursuant to *State v. Knapstad*. (*Id.* at ¶ 6.) On June 28, 2010, the Court concluded that the charge could not be supported beyond a reasonable doubt and dismissed the Threats to do Harm charge against Mr. Fontana. (*Id.*, Ex. A at 7.)

Mr. Fontana filed this suit on February 11, 2013. His Complaint includes claims for "malicious prosecution," "knowing and wrongful denial of his civil rights to privacy, liberty, jeopardy of his liberty, and threats to deprive him of his liberty without cause"; "violation of its own policies regarding access to its services and premises"; "violation of plaintiff's Constitutional rights and/or plaintiff's civil rights under 42 U.S.C. § 1983"; and "[n]egligent

---

[6] The latter charge was ultimately dismissed because Mr. Fontana had a legitimate prescription for the medications in his possession. That charge is not at issue in this case.

1    supervision of employees who used the authority of their official positions and/or acted in their

2    official capacities to violate his rights and to maliciously prosecute him." (Dkt. No. 1 at 5.) As

3    the quoted language indicates, the actual claims raised and sources of law relied upon are not

4    clearly delineated, but based on the parties' briefing, the Court considers the following claims to

5    be at issue: (1) a Fourth Amendment claim for unlawful arrest under 42 U.S.C. § 1983; (2) a

6    *Monell* policy or custom claim under 42 U.S.C. § 1983; (3) a malicious prosecution claim under

7    state and federal law; and (4) a negligent supervision claim under Washington law.

8            Defendants now move for summary judgment. Defendants argue that collateral estoppel

9    precludes Mr. Fontana from re-litigating the existence of probable cause; that even if the Court

10   finds it necessary to engage in that inquiry, probable cause existed to support Mr. Fontana's

11   arrest, thereby precluding Plaintiff's unlawful arrest and malicious prosecution claims; and that

12   even if the Court disagrees, Sgt. Nordenger is entitled to qualified immunity and the remaining

13   individual defendants did not sufficiently participate in the alleged constitutional deprivation so

14   as to render them liable. Defendants also request summary judgment as to Plaintiff's malicious

15   prosecution claim on the ground that there exists no evidence that Sgt. Nordenger acted with

16   malice and that he is entitled to qualified immunity because he conferred with the prosecutor

17   before posting the probable cause bulletin. And finally, as to Plaintiff's negligent supervision and

18   *Monell* claims, Defendants argue that Plaintiff has no evidence to support these claims.

19   **II.    DISCUSSION**

20           Before turning to the merits of Defendants' motion for summary judgment, the Court first

21   addresses a number of threshold issues that arose during the parties' briefing. These issues

22   include Defendants' failure to file an Answer to Plaintiff's Complaint, as well as the parties'

23   expert witness declarations and accompanying motions to strike.

24           **A.    Defendants' Failure to File an Answer**

25           The Court first addresses Defendants' inexplicable failure to file an Answer. Defendants

26   assert in their summary judgment motion that (i) Plaintiff cannot state a claim in light of the

1   undisputed evidence; and (ii) that they are entitled to qualified immunity. Each argument is an

2   affirmative defense that must be raised in a responsive pleading or by motion under Rule 12

3   before a responsive pleading is filed; if not appropriately raised, Rule 12 only permits a "failure

4   to state a claim" defense at trial or by a Rule 12(c) motion for judgment on the pleadings. *See*

5   *Homez v. Toledo*, 446 U.S. 635, 640 (1980) (qualified immunity is an affirmative defense that

6   must be pleaded by defendant); Fed. R. Civ. P. 8(b)–(c) (defendant must include defenses in

7   responsive pleading and admit or deny allegations contained in complaint); Fed. R. Civ. P. 12(b)

8   (requiring defenses to be asserted in responsive pleading within  21 days of complaint or by

9   motion made before pleading is due); Fed. R. Civ. P. 12(h)(2) (failure to state a claim defense

10  may be raised in any opening pleading, a motion for judgment on the pleadings under Rule 12(c),

11  or at trial). Here, Plaintiff filed his complaint on February 11, 2013. Defendants did not file any

12  Rule 12 motions to dismiss, and as of the date of this Order, they have still not filed an Answer.

13      The defenses asserted in Defendants' summary judgment motion would normally be

14  waived or, at a minimum, available only at trial or through a motion for judgment on the

15  pleadings. But as other district courts have noted, the Ninth Circuit has "liberalized the rules

16  regarding waiver of affirmative defenses such that district courts have discretion to permit the

17  assertion of an affirmative defense for the first time on summary judgment, provided that there is

18  no prejudice to the nonmoving party and the nonmoving party is given an opportunity to

19  respond." *Alcarmen v. J.P. Morgan Chase Bank*, No. C13-1575, 2014 WL 3368647, at *5 (N.D.

20  Cal. July 8, 2014); *see Simmons v. Navajo Cnty.*, 609 F.3d 1011, 1022 (9th Cir. 2010). A

21  defense, including qualified immunity, may be raised in the summary judgment motion even if it

22  was not listed in the answer or if no answer was ever filed. *See*, *e.g.*, *Ledo Fin. Corp. v.*

23  *Summers,* 122 F.3d 825, 827 (9th Cir. 1997) (affirmative defense properly raised for the first

24  time on summary judgment even where defendant failed to file an answer); *Camarillo v.*

25  *McCarthy,* 998 F.2d 638, 639 (9th Cir. 1993) (qualified immunity properly raised in summary

26  judgment motion even where it was not included as an affirmative defense in defendant's

1   answer).

2        Mr. Fontana has had an opportunity to respond to Defendants' arguments by briefing the

3   issues and presenting evidence to the Court. He has also had roughly one year to seek the entry

4   of default and default judgment against Defendants based on their failure to answer the

5   complaint, which would have been the appropriate response. *See Ledo*, 122 F.3d at 827. He did

6   not do so, and in the course of this case, he has not taken issue with Defendants' failure to file an

7   Answer. He appears to have had notice of the defenses (which are common in this type of case)

8   and has proceeded to litigate the case as if those defenses had been properly preserved. The

9   Court accordingly proceeds to address Defendants' motion.

10       **B.    The Parties' Expert Witnesses**

11        The Court next addresses the parties' expert witness declarations. Defendants supported

12   their motion for summary judgment with the declarations of Ms. Lori Sutter and Mr. John

13   Landenburg, among others. Ms. Sutter is a "retired law enforcement officer with over 30 years of

14   commissioned law enforcement officer experience" (Dkt. No. 21 at ¶ 2), and Mr. Landenburg is

15   a former prosecutor and defense attorney with approximately 40 years of legal experience. (Dkt.

16   No. 22 at ¶ 2.) Similarly, Plaintiff offered the declaration of Dr. Robert Keppel, who has 40 years

17   experience in the law enforcement and criminal justice fields. (Dkt. No. 30 at ¶ 3.) Plaintiff also

18   offered the declaration of Mr. James Bible, Plaintiff's criminal defense attorney in the underlying

19   prosecution, but did not disclose Mr. Bible as an expert witness. (Dkt. No. 28).

20        Defendants move to strike the declaration of Mr. Bible on the ground that he is "offering

21   improper expert opinion apparently based on his training and experience" even though he was

22   not disclosed as an expert witness. (Dkt. No. 31 at 2.) The Court denies the request. Mr. Bible's

23   declaration recounts facts of which he has personal knowledge—namely, the occurrences

24   involved in Plaintiff's underlying prosecution. In large part, he has not offered impermissible

25   expert testimony. He does offer one single opinion that in his experience, this prosecution was

26   "meritless," but the Court does not find that single statement to be a basis for striking the entire

1    declaration. To the extent Mr. Bible believes the prosecution to have been meritless, the Court

2    declines to consider that opinion in addressing Defendants' summary judgment motion.

3    The Court strikes, *sua sponte*, the portions of Ms. Sutter's, Mr. Landenberg's, and Dr.

4    Keppel's declarations that offer legal conclusions veiled in the guise of expert testimony. While

5    experts may permissibly opine as to standard law enforcement practices and whether defendants'

6    conduct is in accord with those practices, they may not offer legal conclusions that are solely

7    within the Court's or the fact-finder's province. *See Hangarter v. Provident Life and Acc. Ins.*

8    *Co.*, 373 F.3d 998, 1016 (9th Cir. 2004) (explaining that while "ultimate issue" testimony is not

9    *per se* impermissible, "an expert witness cannot give an opinion as to her *legal conclusion*, *i.e.*,

10   an opinion on an ultimate issue of law."). Such an opinion does not aid the jury in making its

11   decision; it merely attempts to substitute the expert's judgment for that of the jury, or in this

12   case, the Court. *Mukhtar v. California State University, Hayward,* 299 F.3d 1053, 1066 n.10 (9th

13   Cir. 2002); *see also* Weinstein's Federal Evidence § 704.04[2][a] (2d ed. 2008) (explaining

14   that opinion testimony should be excluded for lack of helpfulness where it "supplies the jury

15   with no information other than the witness's view of how the verdict should read"). In the

16   specific context of probable cause, this means that expert testimony is impermissible insofar as it

17   attempts to explain the legal requirements of probable cause or discusses whether probable cause

18   did or did not in fact exist in this case. *See Torres v. City of Los Angeles,* 548 F.3d 1197, 1214

19   n.11 (9th Cir. 2008); *Stuart v. United States,* 23 F.3d 1483, 1487 (9th Cir.1994). Accordingly, the

20   Court will not rely upon the parties' expert declarations to the extent that they purport to opine

21   on the legal requirements of probable cause or whether probable existed to support Mr.

22   Fontana's arrest. (*See* Dkt. Nos. 21 at ¶ 14; 22 at ¶ 10; 30 at ¶ 12.)

23   ## C.    Defendant's Summary Judgment Motion

24   ### 1.    Legal Standard

25   The Court next turns to Defendants' summary judgment motion. Pursuant to Rule 56 of

26   the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant

1   shows that there is no genuine dispute as to any material fact and the movant is entitled to

2   judgment as a matter of law." Fed. R. Civ. P. 56(a). In making such a determination, the Court

3   must view the facts and inferences to be drawn therefrom in the light most favorable to the

4   nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–50 (1986). Once a motion

5   for summary judgment is properly made and supported, the opposing party "must come forward

6   with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v.*

7   *Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Material facts are those that may affect the

8   outcome of the case, and a dispute about a material fact is genuine if there is sufficient evidence

9   for a reasonable jury to return a verdict for the non-moving party. *Anderson*, 477 U.S. at 248–49.

10  Ultimately, summary judgment is appropriate only against a party who "fails to make a showing

11  sufficient to establish the existence of an element essential to that party's case, and on which that

12  party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

13                  **2.        Collateral Estoppel**

14          Defendants argue from the outset that Plaintiff is collaterally estopped from re-litigating

15  whether probable cause existed to support his arrest and prosecution. Because the Auburn

16  municipal court judge found that probable cause existed to bind Mr. Fontana over for trial on the

17  charges, Defendants argue, Plaintiff's unlawful arrest and malicious prosecution claims

18  necessarily fail because each of them depends on Plaintiff proving the absence of probable cause.

19  The Court agrees with Defendants that Plaintiff's claims are barred on this basis.

20          In Washington, a litigant is estopped from raising an issue in a subsequent proceeding if

21  "(1) the issue decided in the prior adjudication is identical with the one presented in the second

22  action; (2) the prior adjudication [] ended in a final judgment on the merits; (3) the party against

23  whom the plea is asserted was a party or in privity with the party to the prior adjudication; and

24  (4) application of the doctrine does not work an injustice." *Thompson v. Dep't of Licensing,* 138

25  Wn.2d 783, 790 (Wash. 1999); *Shuman v. Dep't of Licensing,* 108 Wn.App. 673, 677–78 (Wash.

26  2001). Significantly, the Ninth Circuit has repeatedly held that when an individual has the

1   opportunity to challenge a probable cause determination in the course of prior state court

2   proceedings, such as in a preliminary hearing as to whether the defendant may be bound over on

3   the charges, he may be barred from re-litigating the issue in a subsequent § 1983 action. *Awabdy*

4   *v. City of Adelanto,* 368 F.3d 1062, 1068 (9th Cir. 2004); *see Haupt v. Dillard,* 17 F.3d 285, 289

5   (9th Cir. 1994) (holding that state judge's finding that probable cause existed to bind a defendant

6   over for trial barred the individual's subsequent re-litigation as to whether probable cause existed

7   to support claims under § 1983). Collateral estoppel will not bar re-litigation, however, "when

8   the decision to hold the defendant to answer was made on the basis of fabricated evidence

9   presented at the preliminary hearing or as the result of other wrongful conduct by state or local

10   officials." *Awabdy*, 368 F.3d at 1068 (citing *Haupt*, 17 F.3d at 289.)) Collateral estoppel may

11   also be inapplicable in an unlawful arrest case if the state judge's probable cause determination

12   was based on evidence obtained after the arrest, since the issues would not be identical. *Id.*

13        Mr. Fontana is barred from re-litigating probable cause in this matter. Based on the court

14   records provided by Mr. Bible, Plaintiff's previous attorney, it is undisputed that Judge Burns of

15   the Auburn municipal court arraigned Mr. Fontana, affirmatively finding that probable cause

16   existed to bind Mr. Fontana over for trial on the Threats to do Harm charge. (*See* Dkt. No. 28,

17   Ex. A at 5 ("DETERMINATION OF PROBABLE CAUSE ESTABLISHED" on December 24,

18   2009 at Mr. Fontana's arraignment).) Mr. Fontana was represented by counsel at that hearing.

19   (*Id.*) Because this fact is undisputed, the Court has no trouble concluding that the elements of

20   collateral apply under the circumstances. The issue litigated is identical, namely, whether

21   probable cause supported Mr. Fontana's arrest and detention. And of course, Mr. Fontana was

22   the subject of that proceeding as well. While a preliminary hearing probable cause determination

23   itself is not technically a "final judgment on the merits" as one would normally use that term, the

24   Ninth Circuit and other courts have, as explained below, held that a probable cause determination

25   made at a preliminary hearing is sufficiently firm to satisfy the requirements of the "final

26   judgment" collateral estoppel requirement. Further, the Court notes that Mr. Fontana's previous

1   case did in fact end with a final adjudication—the claim against him was dismissed. While he

2   ultimately prevailed, the preliminary hearing determination of probable cause was a part of that

3   proceeding, which ended in a final judgment. *See*, *e.g.*, *Wakgira v. City of Seattle*, Case No. C08-

4   1108, 2009 WL 2406330, at *14 (W.D. Wash. Aug. 3, 2009) (applying Washington law and

5   holding that collateral estoppel barred re-litigation of probable cause where state judge found

6   probable cause at preliminary hearing).

7          Plaintiff offers two arguments to avoid this conclusion. First, he argues that collateral

8   estoppel cannot apply because "there was no conviction" in this case by way of trial or guilty

9   plea. (Dkt. No. 26 at 11.) The Court disagrees, and the absence of a conviction is not fatal to

10  Defendants' collateral estoppel argument. The Ninth Circuit, this court, and others have

11  repeatedly recognized that a probable cause determination at a preliminary hearing can bar re-

12  litigation of the issue in an unlawful arrest or malicious prosecution case even where the

13  individual was not convicted. *See*, *e.g.*, *Haupt*, 17 F.3d at 288–89 (plaintiff precluded from

14  asserting the lack of probable cause, as required to support unlawful arrest and malicious

15  prosecution claims, where probable cause was established at preliminary hearing even though he

16  was later acquitted); *Tompkins v. Spokane Cnty.*, Case No. C07-0195, 2009 WL 269386 (E.D.

17  Wash. Jan. 30, 2009) (collateral estoppel barred unlawful arrest claim where probable cause

18  necessarily determined by Washington state judge even though claims were later dismissed);

19  *Wakgira*, 2009 WL 2406330, at *14 (plaintiff barred from re-litigating probable cause even

20  though underlying charges were subsequently dismissed).[7] This makes perfect sense given the

21  significant difference between probable cause to arrest, which is an extremely low standard, and

22  _____

23          [7] *See also McIntosh v. Prestwich*, 277 Fed. App'x. 683 (9th Cir. May 5, 2008) (unpublished) (plaintiff had
    full and fair opportunity to litigate probable cause in state court preliminary hearing); *Boudette v. Singer*, 62 F.3d

24  1423, at *1 (9th Cir. Aug. 7, 1995) (unpublished) (affirming summary judgment for defendants on malicious
    prosecution claim where state judge found probable cause for charges even though defendant later acquitted);

25  *Zermeno v. Stratosphere Corp.*, Case No. C07-0581, 2010 WL 2265167 (D. Nev. June 2, 2010) (false arrest claim
    barred where state judge previously made probable cause determination even though charges were subsequently

26  dismissed).

1    the need to prove guilt "beyond a reasonable doubt" to obtain a conviction—the inability to

2    prove the latter has no bearing on the existence probable cause. In light of the ample authority

3    demonstrating that a conviction by way of guilty plea or trial is not necessary in order for

4    collateral estoppel to bar re-litigation of a state-court probable cause determination, and

5    Plaintiff's failure to either address this authority or provide any persuasive case law to the

6    contrary, the Court rejects Plaintiff's argument.[8]

7        Second, Plaintiff reasons that "if the issue of probable cause was deemed fully and fairly

8    litigated, then the defense would be precluded from asserting that probable cause existed." (Dkt.

9    No. 26 at 11.) The Court is not persuaded. Such an argument is merely an undeveloped reference

10    to the offensive use of collateral estoppel, which may have had some force if the Auburn

11    municipal judge had determined that probable cause was absent. *See, e.g.*, *Wiley v. Washington

12    Patrol*, C05-1948, 2007 WL 1655273, at *4 (W.D. Wash. June 7, 2007) (officer defendants

13    precluded from asserting the existence of probable cause as a defense to unlawful arrest claim

14    where state court had determined that plaintiff's arrest was not supported by probable cause).

15    However, the municipal judge here undisputedly concluded that probable cause existed. And to

16    the extent that Plaintiff's argument is construed as an assertion that an offensive use of probable

17    cause would be appropriate because the case was subsequently dismissed on a *Knapstad* motion,

18    the Court would disagree for the same reason it rejected Plaintiff's first argument. As another

19    judge in this district has concluded, a subsequent dismissal on a *Knapstad* motion—which

20

---

21       [8] Plaintiff's reliance on *Clark v. Barnes*, 150 Wn.2d 905 (Wash. 2004) is of no assistance. In that case, the

22    Washington Supreme Court held that a defendant's *Alford* plea may not be used to collaterally estop that individual from re-litigating the existence of probable cause in a subsequent civil case. That decision was based on the fact that

23    when a defendant enters an *Alford* guilty plea, he or she pleads guilty without admitting to the underlying facts (or actually being guilty) and completely waives the opportunity to litigate the factual issues involved in the case. Thus,

24    the court reasoned, to view an *Alford* plea as a "full and fair opportunity" to litigate the issues involved in a case would work an injustice. The scenario at hand, however, does not involve an *Alford* plea or Mr. Fontana's willing

25    waiver of the opportunity to litigate the issues herein, and the *Clark* case did not address the issue presented in Mr. Fontana's case. Instead, Mr. Fontana was arraigned before a judge while represented by counsel, and that judge

26    made the express determination that probable cause existed to bind him over for trial. *Cf. Haupt*, 17 F.3d at 288; *accord Wakgira*, 2009 WL 2406330, at *14.

1    requires dismissal where no reasonable trier of fact could find the elements of the crime beyond a

2    reasonable doubt—"does not establish in that case or any other that the prosecution lacked

3    probable cause in filing the charge. . . . [*Knapstad*] references the highest standard of proof in

4    American jurisprudence. In stark contrast is the lowest, probable cause." *Lassiter v. City of*

5    *Bremerton*, C05-5320, 2006 WL 2009328, at *2 (W.D. Wash. July 17, 2006). Under the

6    circumstances of this case, it is Mr. Fontana, not Defendants, who are on the losing end of the

7    collateral estoppel argument.

8           In sum, Plaintiff's unlawful arrest and malicious prosecution claims, each of which

9    requires Plaintiff to prove the absence of probable cause for his arrest, are barred as a matter of

10   law. Even if the Court were to consider the claims further, however, the Court would conclude

11   that Sgt. Nordenger is entitled to qualified immunity because the legality of Plaintiff's arrest was

12   at least arguable and he conferred with an Auburn prosecutor, who determined that charges

13   should be filed and subsequently filed the charges.

14          **3.     Plaintiff's § 1983 Claims and Defendants' Qualified Immunity**

15          "Qualified immunity shields government officials from civil damages liability unless the

16   official violated a statutory or constitutional right that was clearly established at the time of the

17   challenged conduct." *Acosta v. City of Costa Mesa*, 718 F.3d 800, 824 (9th Cir. 2013) (citing

18   *Reichle v. Howards*, --- U.S. ---, 132 S. Ct. 2088, 2093 (2012)). "Assessing whether an official is

19   entitled to immunity is a two prong inquiry[,]" and the Court may address the prongs in

20   whichever order it deems appropriate under the circumstances. *Id.* Under the first prong, the

21   Court determines whether, "[t]aken in the light most favorable to the party asserting the injury, []

22   the facts alleged show [that] the officer's conduct violated a constitutional right[.]" *Id.* (quoting

23   *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Under the second prong, the Court determines

24   whether the right allegedly violated was "clearly established." To be clearly established, "the

25   contours of the right must be sufficiently clear that a reasonable official would understand that

26   what he is doing violates that right." *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 639

1   (1987)). Ultimately, the Supreme Court has explained, qualified immunity "provides ample

2   protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v.*

3   *Briggs,* 475 U.S. 335, 341 (1986). Here, the Officer Defendants also move for summary

4   judgment on the grounds that no constitutional violations were committed, and that even if the

5   Court finds that violations occurred under Plaintiff's version of the facts, Defendants are each

6   entitled to qualified immunity.

7                       ***i.        Plaintiff's Unlawful Arrest Claim Under § 1983***

8           The Court begins with Mr. Fontana's § 1983 claim that his arrest was unsupported by

9   probable cause. The Fourth Amendment protects individuals against "unreasonable searches and

10  seizures." U.S. Const. amend. IV. A warrantless arrest, which constitutes a "seizure," is

11  "unreasonable" and thus unconstitutional if it is not supported by probable cause—*i.e.*, if "the

12  facts and circumstances within [the arresting officer's] knowledge are [not] sufficient for a

13  reasonably prudent person to believe that the suspect has committed a crime." *Rosenbaum v.*

14  *Washoe County*, 663 F.3d 1071, 1076 (9th Cir. 2011); *see United States v. Alaimalo,* 313 F.3d

15  1188, 1193 (9th Cir. 2002) ("Probable cause requires only a fair probability or substantial chance

16  of criminal activity[.]"). To prevail on a § 1983 false arrest claim, a plaintiff must demonstrate

17  that there was no probable cause to arrest him based on the facts known to the officer at the time

18  of the arrest. *Norse v. City of Santa Cruz*, 629 F.3d 966, 978 (9th Cir. 2010) (en banc).

19          The Ninth Circuit has summarized the requisite qualified immunity analysis in the

20  context of a false arrest claim. The Court first determines whether there was probable cause for

21  the arrest, without which the arrest is unconstitutional. *Rosenbaum*, 663 F.3d at 1076. Even if an

22  unconstitutional arrest occurred, however, an officer may still be entitled to qualified immunity if

23  "it is *reasonably arguable* that there was probable cause for arrest—that is, whether reasonable

24  officers could disagree as to the legality of the arrest such that the arresting officer is entitled to

25  qualified immunity." *Rosenbaum*, 663 F.3d at 1076 (emphasis in original); *see Norse*, 629 F.3d

26  at 978 ("a government official is entitled to qualified immunity on a false arrest claim if a

1   reasonable officer in his position could have believed that probable cause existed"). Ultimately,

2   the "linchpin of qualified immunity analysis is the reasonableness of the officer's conduct."

3   *Rosenbaum*, 663 F.3d at 1076.

4          Defendants assert that the arresting officer had probable cause to arrest Mr. Fontana for

5   "Threats to Do Harm."[9] Under Auburn City Code § 9.14.010, "it is unlawful for any person to

6   communicate, directly or indirectly, the intent to cause bodily injury to another person or the

7   intent to cause physical damage to the property of another." (Dkt. No. 22 at ¶ 8.) Defendants

8   argue that probable cause existed to arrest Mr. Fontana for Threats to do Harm based on the

9   following information that was communicated to Sgt. Nordenger (and subsequently made known

10   to the arresting officers via Sergeant Nordenger's probable cause bulletin): (1) the report that Mr.

11   Fontana stated to the AKUSA bank teller, Nicole Firth, that she should look out for him on the

12   news "in the near future," that she would recognize his "mug shot," and that "its going to be big,

13   bigger than what happened with the Lakewood police officers thing"; (2) the fact that Mr.

14   Fontana was previously a suspect in a homicide investigation, but ultimately cleared via DNA;

15   (3) that Mr. Fontana attempted to enter the Tacoma Dome for the Lakewood Officer's Funeral

16   only two days after making the statements at issue, but was turned away at the door after being

17   spotted by a marksman team; and (4) that Mr. Fontana suffered from an unidentified mental

18   illness, though this could not be confirmed. Defendants also argue that it was reasonable to

19   believe that probable cause existed because Officer Nordenger conferred with an Auburn

20   prosecutor who agreed that probable cause existed before posting the probable cause bulletin.

21          In light of the collateral estoppel analysis herein, Plaintiff's unlawful arrest claim

22   _____

23       [9] As noted elsewhere, Sgt. Nordenger did not arrest Mr. Fontana—Officer Feero, who is not a named

24   defendant, actually arrested him. Under the "collective knowledge" doctrine, the Court considers the information
known to all investigating officers where there has been communication among the law enforcement officials
through a probable cause bulletin. *See United States v. Jensen*, 425 F.3d 698, 704–705 (9th Cir. 2005) (summarizing

25   doctrine). Here, the information was gathered primarily by Sgt. Nordenger, who then posted a probable cause
bulletin; that bulletin and Sgt. Nordenger's knowledge are accordingly considered "known" to the arresting officer.

26   *See United States v. Hensley*, 469 U.S. 221 (1985) (police officers entitled to rely on radio bulletins based on
reasonable suspicion of other officers).

1  necessarily fails. But regardless of whether probable cause existed to arrest Mr. Fontana,

2  "reasonable officers could disagree as to the legality of the arrest[,]" thereby entitling Sgt.

3  Nordenger to qualified immunity. The Court believes that a reasonable police officer could

4  arguably construe Mr. Fontana's alleged statements as an "indirect[] communication [of] the

5  intent to cause bodily injury to another person"—to wit, police officers. It is irrelevant that Mr.

6  Fontana now claims that he did not make the statements, as neither party disputes that the

7  AKUSA bank teller reported the comments on December 7, 2009, provided a typed statement to

8  the Auburn PD which Sgt. Nordenger received, and identified Plaintiff in a photo montage as the

9  individual who made the statements. *See Ewing v. City of Stockton*, 588 F.3d 1218, 1225 (9th

10  Cir. 2009) (identified citizen witnesses are generally presumed reliable). Even further, a

11  reasonable police officer could arguably construe Mr. Fontana's attempt to enter the Lakewood

12  Officers' funeral two days after stating that he was going to do something "bigger than

13  Lakewood" as additional support for viewing his previous statements as a communication of an

14  "intent" to harm police officers.[10]

15      This conclusion is supported by the Auburn judge's probable cause determination the fact

16  that Sgt. Nordenger conferred with the Auburn prosecutor, who agreed that probable cause

17  existed, before disseminating the probable cause bulletin. Sgt. Nordenger's conference with the

18  Auburn deputy prosecutor does not automatically insulate him from liability, *id.* at 1231, but "it

19  goes far to establish qualified immunity" because it demonstrates that he acted reasonably and in

20  good faith by seeking a second opinion from a qualified attorney. *Id.* (noting that even where

21  evidence was slim to make an arrest, officers' conference with prosecutor before doing so

22  "tipped the scale in favor of qualified immunity"). It is undisputed that Sgt. Nordenger found the

23  _____

24      [10] This, of course, is not to say that Mr. Fontana in fact intended to cause harm by attending the funeral,
    which as a citizen he had a right to attend. However, when this innocent act is viewed in light of the fact that he had

25  allegedly stated just two days before that his "mugshot" would be on the news "in the near future" for doing
    something "bigger" than the murders that resulted in the funeral he was attending, his attendance would arguably be

26  relevant to a police officer in determining whether Mr. Fontana had communicated his intent to physical harm to
    police officers.

ORDER
PAGE - 18

1    Auburn prosecutor while in the Courthouse and had a short conversation with him—on this

2    basis, Plaintiff argues that there exists a genuine issue of material fact as to what the two men

3    discussed and whether Sgt. Nordenger made a full presentation of the facts. But the Court is not

4    persuaded. It is undisputed that Sgt. Nordenger provided the prosecutor with the case file, and

5    Sgt. Nordenger testified that the two discussed Mr. Fontana's statements, their proximity to the

6    Lakewood murders, Mr. Fontana's "strange behavior in the Grocery Outlet parking lot," and

7    information received from other agencies. (Dkt. No. 24 at ¶ 17.) Plaintiff offers nothing that

8    would dispute the actual substance of this conversation. While the conversation may have been

9    short and Sgt. Nordenger admittedly expressed his desire to arrest Mr. Fontana, that alone does

10   not undermine the undisputed fact that Sgt. Nordenger did communicate the known facts as

11   contained in the police report and confer as to whether probable cause existed to arrest Mr.

12   Fontana *before* going out and arresting him. While not dispositive, this act supports the Court's

13   conclusion that Sgt. Nordenger is entitled to qualified immunity based on the reasonableness of

14   his decision to post the probable cause bulletin and the conclusion that, at a minimum,

15   reasonable officers could disagree as to the legality of Mr. Fontana's arrest.[11]

16                          ***ii.***     ***Plaintiff's Malicious Prosecution Claim***

17           The Court also concludes that Sgt. Nordenger is entitled to qualified immunity on

18   Plaintiff's malicious prosecution claim. A claim of malicious prosecution is generally not

19   cognizable under § 1983 if process is available within the state judicial system to provide a

20   remedy. *Bretz v. Kelman*, 773 F.2d 1026, 1031 (9th Cir. 1983) (en banc). However, the Ninth

21   Circuit has enunciated an important exception to this general rule. *Lacey v. Maricopa Cnty.*, 649

22   F.3d 1118, 1133 (9th Cir. 2011). A plaintiff can prevail on a federal malicious prosecution claim

23

24   _____

25   [11] The additional bases for finding probable cause, namely, Mr. Fontana's previous connection to the
     Federal Way homicide and an unspecified mental illness (which Sgt. Nordenger expressly stated he could not
     confirm) are, in the Court's view, irrelevant to the probable cause determination. But based on the analysis above,

26   such a finding does not salvage Plaintiffs' claim for unlawful arrest.

ORDER
PAGE - 19

1  if she shows "that the defendants prosecuted [her] with malice and without probable cause, and

2  that they did so for the purpose of denying [her] equal protection or another specific

3  constitutional right." *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1066 (9th Cir. 2004) (quoting

4  *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1189 (9th Cir. 1995)). To make out a federal

5  malicious prosecution claim, a plaintiff must prove, in addition to the elements above, the

6  elements of a state-law malicious prosecution claim. Under Washington law, a plaintiff must

7  prove: "(1) that the prosecution claimed to have been malicious was instituted or continued by

8  the defendant; (2) that there was want of probable cause for the institution or continuation of the

9  prosecution; (3) that the proceedings were instituted or continued through malice; (4) that the

10  proceedings terminated on the merits in favor of the plaintiff, or were abandoned; and (5) that the

11  plaintiff suffered injury or damage as a result of the prosecution." *Hanson v. City of Snohomish,*

12  121 Wash.2d 552, 558 (Wash. 1993).

13       There exists a rebuttable presumption that a prosecutor exercises independent judgment

14  in deciding to file criminal charges, thus immunizing the investigating officers from liability for

15  injuries suffered after the charging decision. *Id.* at 1067. This presumption may be rebutted with

16  evidence that the officers "improperly exerted pressure on the prosecutor, knowingly provided

17  misinformation to him, concealed exculpatory evidence, or otherwise engaged in wrongful or

18  bad faith conduct that was actively instrumental in causing the initiation of legal proceedings."

19  *Id.* "A plaintiff's account of the incident in question, by itself, does not overcome the

20  presumption of independent judgment." *Newman v. County of Orange,* 457 F.3d 991, 994 (9th

21  Cir. 2006). Rather, "a plaintiff must present information in addition to his own account that

22  contradicts the police report" in order to show that the prosecutor relied on the police

23  investigation and arrest. *Beck v. City of Upland,* 527 F.3d 853, 863 n.9 (9th Cir. 2008) (citing

24  *Newman,* 457 F.3d at 994–95). "A police officer who maliciously or recklessly makes false

25  reports to the prosecutor may be held liable for damages incurred as a proximate result of those

26  reports." *Blankenhorn v. City of Orange,* 485 F.3d 463, 482 (9th Cir. 2007).

1    Sgt. Nordenger is entitled to qualified immunity on this claim. There is no genuine

2    dispute as to whether Sgt. Nordenger provided the Auburn prosecutor with the case file and

3    discussed the minimal facts involved in this case. Under these circumstances, the Court sees no

4    basis upon which Plaintiff can overcome the presumption that the Auburn prosecutor's decision

5    to file the charges was in fact his own decision, which in turn immunizes Sgt. Nordenger from

6    liability for damages caused as a result of the prosecution.

7    Plaintiff argues that there is a question of fact as to whether Sgt. Nordenger fully and

8    truthfully communicated to the prosecuting attorney the facts and circumstances within his

9    knowledge (all of which was contained in the probable cause bulletin), stating that the

10   information provided was "all false or misleading." But the Court disagrees. Sgt. Nordenger's

11   knowledge that Plaintiff attempted to attend the Lakewood Officers' funeral at the Tacoma

12   Dome was based on the reports of other law enforcement officers—whether Mr. Fontana did or

13   not attend the funeral does not undermine the fact that Sgt. Nordenger has received reports from

14   fellow officers to this effect. The case file clearly demonstrates that this statement was based on

15   the reports of other officers, and Plaintiff offers no evidence that Sgt. Nordenger told the

16   prosecuting attorney that he personally witnessed Mr. Fontana at the Tacoma Dome.

17   Insofar as Plaintiff argues that the remaining information was false or misleading, the

18   Court disagrees for the same reason: Sgt. Nordenger did not tell the prosecutor (and the case file

19   does not state) that Mr. Fontana definitely had a mental illness; he said he "might" but noted the

20   fact could not be confirmed. Finally, insofar as Sgt. Nordenger had believed that Mr. Fontana

21   disliked police and was a suspect in a Federal Way homicide investigation, the Court disagrees

22   that these representations were "false and misleading" or otherwise relevant to the probable

23   cause determination. The bulletin clearly indicates that Mr. Fontana was cleared in the Federal

24   Way investigation and there is no suggestion that Sgt. Nordenger stated otherwise to the

25   prosecuting attorney. As for Sgt. Nordenger's subjective belief that Mr. Fontana disliked police,

26   that belief was reasonable given the evidence that Sgt. Nordenger had at the time. There is no

1   evidence that he improperly forced the prosecutor to file charges based only on that statement.

2   Because Mr. Fontana has not provided evidence that Sgt. Nordenger actually fabricated police

3   reports, provided false facts, or improperly pressured the prosecuting attorney into filing the

4   charges, he is entitled to qualified immunity as to Plaintiff's malicious prosecution claim.[12]

5                    ***iii.***        ***Plaintiff's Claims Against the Other Officer Defendants***

6          Plaintiff named as defendants, in addition to the City of Auburn and Sgt. Nordenger, Sgt.

7   Brian Williams, Officer Weller, Officer Mast, Officer Tyler Christian, Officer Glen, Officer

8   Person, Officer Bernard, and John/Jane Does Officers.[13] (Dkt. No. 1.) Plaintiff also requests that

9   the Court issue a liability ruling as to a non-defendant, Officer Feero, and implies that if it will

10  not do so, Plaintiff should be granted leave to add Officer Feero as a defendant. The Court

11  concludes that Plaintiff's claims against the other individual Defendants also fail as a matter of

12  law and declines to either issue a ruling as to Officer Feero or permit Plaintiff to add him as a

13  defendant.

14         The Ninth Circuit has explained that "Section 1983 has a causation requirement, with

15  liability extending to those state officials who subject, or cause to be subjected, an individual to a

16  deprivation of his federal rights." *Lacey*, 693 F.3d at 915–16. Under the "integral participation"

17  rule, an officer must have "some fundamental involvement in the conduct that allegedly caused

18  the violation." *Blankenhorn*, 485 F.3d at 492 n.12. In the context of a false arrest claim—the

19  only claim pursued here against the remaining individuals—a plaintiff must prove that the

20  individual officer either arrested him or otherwise ordered or procured the arrests without

21  probable cause. *Larez v. City of L.A.*, 946 F.2d 630, 645 (9th Cir. 1991).

22  _____

23         [12] To the extent that Plaintiff's malicious prosecution claim is purely a state-law claim, the Court declines

24  to exercise its supplemental jurisdiction over that claim in light of the fact that summary judgment has been awarded
    to Defendants on all federal claims for relief. *See* 28 U.S.C. § 1367(c) (district court may decline to exercise
    supplemental jurisdiction where it has dismissed all claims over which it has original jurisdiction); *Acri v. Varian*

25  *Assocs., Inc.*, 114 F.3d 999, 1001 n. 3 (9th Cir.1997) (en banc) (explaining that a district court may decide *sua*
    *sponte* to decline to exercise supplemental jurisdiction).

26
           [13] Plaintiff's Complaint did not contain the full names of each Defendant.

1    There is no evidence in the record that any of the additional individual actually arrested

2    Plaintiff or otherwise caused him to be arrested through any significant conduct. Officer Mast,

3    who read Mr. Fontana his rights, did not arrest Plaintiff; he merely explained to Mr. Fontana his

4    rights *after* he had been arrested. As for the other individuals, Plaintiff does not even attempt to

5    delineate their actual participation in this matter. (*See* Dkt. No. 26 at 24.) The claims against all

6    individual defendants other than Sgt. Nordenger accordingly fail for lack of integral participation

7    in the alleged constitutional deprivations. *See*, *e.g.*, *Torres*, 548 F.3d at 1206 (affirming summary

8    judgment for detective defendant where undisputed evidence showed that the detective "was not

9    present when [the plaintiff] was arrested, and there [existed] no evidence that [the detective]

10   instructed the other detectives to arrest [the plaintiff] or that any of those detectives consulted

11   with [the defendant] before making the arrest]); *Dunn v. Hyra*, 676 F.Supp.2d 1172, 1187 (W.D.

12   Wash. 2009) ("Because Officer Hyra did not arrest [the plaintiff], he cannot be liable for

13   *unlawfully* arresting him.) (emphasis in original).

14   The Court also denies Plaintiff's request for (i) a liability ruling as to Officer Feero or (ii)

15   leave to add Officer Feero as a defendant at this late stage of the case. Plaintiff explains that even

16   though this case has been pending since February 2013, "it was uncovered after the case was

17   filed that Officer Feero handcuffed Mr. Fontana." (Dkt. No. 26 at 24.) This argument ignores that

18   Mr. Fontana has had the police reports in this case since his previous criminal case was brought

19   in Auburn Municipal Court (in 2009), that Plaintiff produced those same reports to Defendants in

20   this case in August 2013 during discovery, and that Defendants' counsel directed Plaintiff's

21   counsel to the language in those reports that plainly indicated Officer Feero's role as the

22   arresting officer on November 6, 2013, the deadline to add parties in this matter. Because

23   Plaintiff has offered no explanation as to why a motion to add Officer Feero was not filed within

24   the deadline previously set by this Court to do so, much less before filing his opposition to

25   Defendants' summary judgment motion, the Court cannot say that good cause exists to justify

26   leave to add Officer Feero. Even if the Court was inclined to do so, such an amendment would be

futile in light of the Court's holding herein. And finally, to the extent that Plaintiff requests that this Court issue a liability ruling as to an individual who has not been properly named as a defendant and served with the Complaint, the Court has no jurisdiction to do so.

### 4.    Plaintiff's *Monell* Claims Against the City of Auburn

Finally, Defendants move for summary judgment on Plaintiff's negligent supervision and *Monell* claims. (Dkt. No. 25 at 15–17, 19.) Plaintiff did not respond to Defendants' argument on these claims, and affirmatively stated in his opposition that he is pursuing his § 1983 claims against the individual officers and a malicious prosecution claim against Sgt. Nordenger. (Dkt. No. 26 at 1.) Because Plaintiff did not respond to or oppose summary judgment on the negligent supervision or *Monell* claims, the Court grants Defendants' motion as to those causes of action.

## III.    <u>CONCLUSION</u>

For the foregoing reasons, Defendants' motion for summary judgment (Dkt. No. 25) is GRANTED. In light of this ruling, the parties' joint motion to dispense with the admitted facts portion of their pretrial order (Dkt. No. 33) is DENIED as moot. The Court will enter judgment in accordance with this Order, and the Clerk is respectfully directed to CLOSE this case.

DATED this 21st day of August 2014.

John C. Coughenour
UNITED STATES DISTRICT JUDGE

ORDER
PAGE - 24